# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SOCORRO OLIVAS CERA**,

      Plaintiff,

                             **Civil No. 10-092 MV/LFG**

vs.

**MICHAEL J. ASTRUE,**
**Commissioner of the**
**Social Security Administration**,

      Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

    **THIS MATTER** comes before the Court on Plaintiff Socorro Olivas Cera's *Motion and Memorandum of Law in Support of Motion to Remand Administrative Decision* [Doc. 30], filed May 27, 2011.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court recommends granting the motion.

## I.    BACKGROUND

    The following facts are taken from the administrative record, which was lodged with the Court on March 9, 2011, following the September 23, 2010 filing of Mr. Cera's *Complaint* against the Social Security Administration ("SSA"), and the SSA's March 8, 2011

---

[1]  Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the 14-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.  See, e.g., Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).

filing of its *Answer.*  [See Docs. 1, 18, 19].

The plaintiff in this matter, Socorro Olivas Cera, was born on January 25, 1964, and, accordingly, was 44 years old when he appeared on March 6, 2008 for a hearing before an Administrative Law Judge ("ALJ") on his claim for disability insurance benefits.

Approximately two years prior to the hearing, on May 30, 2006, Mr. Cera filed his application for benefits with a protected filing date of March 20, 2005, alleging disability as a result of (1) a spinal compression fracture of the T11 and T12 vertebrae;[2] and (2) osteopenia.[3]  In response to a question in the application asking how these conditions limited his ability to work, Mr. Cera wrote, "Unable to lift[.] I have back pain.  It hurts me a lot.  Cannot lift over 5 lbs." [AR at 177].

In addition to applying for disability insurance benefits, Mr. Cera also sought workers' compensation.   In testimony he provided to the State of New Mexico Workers' Compensation Administration, Mr. Cera explained that he was working for Newt & Butch's Roofing in Taos, New Mexico when he lifted a bucket of tar, "something popped[,]" and the back pain began.  [AR at 153].  While Mr. Cera contends that he became unable to work on March 20, 2005, he states that he did not actually stop working until August 15, 2005. [AR

---

[2]  The T11 and T12 vertebrae are located at the bottom of the thoracic spine.  According to information available on the web site of the University of Maryland Medical Center, compression fractures of the spine usually occur in that area.  See http://www.umm.edu/spinecenter/education/compression_fracture.htm.

[3]  Osteopenia is a condition where bone mineral density ("BMD") is lower than normal peak BMD but not low enough to be classified as the progressive disease of osteoporosis.  See http://www.webmd.com/osteoporosis/tc/osteopenia-overview.

at 177].  Notwithstanding, in the section of his application reserved for additional remarks, he wrote that he "d[id] not recall the exact date of [his] injury [and] continued to work until [he] was let go about August or September." [AR at 181.  In any event, prior to working as a roofer, a job he held from 2002 until 2005, Mr. Cera worked as a meat-packing processor; a laborer; and a digger for a cable communications company. [AR at 177].

Through his *Disability Report*, Mr. Cera explained that his position as a roofer required him to use machines; tools; and equipment, and to lift and carry garbage and boxes of tar "about 2-3 feet once to twice a day." [AR at 178].  He also was required to walk, stand, stoop, and handle both large and small objects. [Id.].  In his *Disability Report*, Mr. Cera wrote that the heaviest weight he lifted was 50 pounds, and the weight he frequently lifted (in one-third to two-thirds of his workday) was 10 pounds. [AR at 178].

By contrast, at the hearing before the ALJ, Mr. Cera described roofing as "very heavy" work.  He testified that he lifted rolls weighing "more than 100 pounds[,]" and that it was while he was lifting one of these 100-pound rolls that he injured his back.  [AR at 356].  When asked whether he was required to lift buckets of tar, further described for him as "[t]he black gooey stuff[,]" Mr. Cera responded, "I don't know what that is." [Id.].

The *Disability Report* reveals that Mr. Cera received care for his back injury (1) at the University of New Mexico Health Sciences Center ("UNMH"); (2) from the Lovelace Sandia Health System; and (3) because he lost his home when he lost his job, at Albuquerque's Healthcare for the Homeless ("HCH").  [AR at 179, 181, 243-244].  He denied that he ever saw a doctor for emotional or mental problems that limited his ability to work. [AR at 179].

Medical records from UNMH dating from October 21, 2005 through May 19, 2008 show that Mr. Cera was seen by a number of physicians there, including, as is relevant here, Craig J. Kilpatrick, M.D.[4] [AR at 257-260].  Dr. Kilpatrick's clinic notes show that, on February 19, 2007, he saw Mr. Cera "for continued evaluation of back pain[, having] seen the patient twice before for the same complaint. . . ." [AR at 257].  The immediately preceding visit occurred one week prior, but the initial visit took place about one and one-half years earlier.  X-rays taken during the initial UNMH visit were negative for a fracture, [see AR at 337],[5] but because Mr. Cera continued to complain of persistent lower thoracic pain, X-rays were repeated.  This second round of testing, according to Dr. Kilpatrick, "revealed a compression fracture of the T12 vertebral body with approximately 30% loss of the vertebral body height." [Id.].  Dr. Kilpatrick recommended that Mr. Cera fill the Naprosyn[6] and Vicodin[7] prescriptions that he had been given during his last appointment but

---

[4]  Among the other providers Mr. Cera saw at UNMH's Family Practice Clinic were Maryanne Clark, Selina Silva, Maria DeArman, and John Leggott. [AR at 198, 200, 202, 205, 214, 217, 220, 222, 261, 325].

[5]  A report from UNMH's radiology department, dated October 21, 2005, indicates that "AP and lateral views of the thoracic spine demonstrate normal alignment with no evidence of compression fracture. . . ." [AR at 337].  On the other hand, a September 20, 2005 radiology report from the Albuquerque Regional Medical Center noted that the "slight loss of height above [Mr. Cera's] T11 and T12 . . . probably represent[] compression fractures." [AR at 297].  Additionally, a clinic note from August 15, 2007 indicated that X-rays revealed T11 and T12 compression fractures that had healed. [AR at 224].

[6]  Naprosyn (naproxen) is used to relieve pain, tenderness, swelling, and stiffness.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526.

[7]  Vicodin is a narcotic pain reliever combining acetaminophen and hydrocodone and is used to relieve moderate to severe pain.  See http://www.drugs.com/vicodin.html.  Vicodin is classified as a Schedule III controlled substance.  See http://www.opiates.com/vicodin.

that he was unable to obtain at that time given his lack of financial resources.  [Id.].  In a *Medical Release/Physician's Statement* provided to him by the Department of Human Service Income Support Division and completed on May 3, 2007, Dr. Kilpatrick deemed Mr. Cera to be permanently disabled, and restricted him from lifting objects weighing more than 10 pounds.  Dr. Kilpatrick's diagnosis was "T12 compression fracture [with] loss of 30% of vertebral height."  [AR at 268].

Notwithstanding Dr. Kilpatrick's assessment, a clinic note dictated on August 15, 2007 by UNMH's Dr. Selina Silva reveals that "[t]he patient is a roofer and he is back to work but he has been having difficulties." [AR at 224].  Dr. Silva also remarked that

> [u]pon physical exam the patient has point tenderness over his lower thoracic spine.  Otherwise, he has no tenderness to palpation.  He is sensory intact from L3 to S1 and motor intact with 5 out of 5 strength from L3 to S1.  His strength is 5 out of 5 and he has a normal gait.  He is able to tandem gait walk and is able to toe walk and heel walk with no problems.

[Id.].  Dr. Silva told Mr. Cera that he might "at some point need some form of vocational rehabilitation as roofing may not be a great job for him as it may cause him continued back pain." [Id.].  Dr. Silva prescribed Vicodin, which she noted "seem[ed] to be controlling [Mr. Cera's] pain well." [Id.].

Additional UNMH medical records show that, as of December 3, 2007, Mr. Cera had received Vicodin on at least six different occasions. [AR at 217].  However, during his December 3, 2007 examination, Mr. Cera told his provider, Dr. Maria DeArman, that he was

taking over-the-counter ibuprofen[8] and Motrin,[9] and that the Motrin kept his back pain under control. [Id.].  Dr. DeArman's notes indicate that, at that time, Mr. Cera was not on any controlled substances, and also that results of a urinalysis, done to determine whether Mr. Cera was taking his medications as scheduled, were negative. [AR at 217-218].  However, Dr. DeArman restarted Mr. Cera on Vicodin on January 25, 2008, calling it "a very efficacious therapy for him" and also noting that Mr. Cera was "well controlled with Vicodin." [AR at 198, 200].  In a *Provider's Statement/Medical Release* that she filled out on April 18, 2008, Dr. DeArman explained that, as a result of his T12 compression fracture, Mr. Cera was unable to work as of May 3, 2004, although the anticipated duration of this inability to work was noted as "unknown."  Dr. DeArman restricted Mr. Cera to lifting objects weighing not more than 15 pounds. [AR at 204].

Records from Healthcare for the Homeless, where Mr. Cera was seen during the year 2006, similarly document his reports of chronic back pain, as well as repeated requests for pain medications.   HCH providers noted a compression fracture at T11 and T12 and prescribed ibuprofen for Mr. Cera.  [AR at 317-321].  On April 18, 2006, HCH's Dr. Sandra Penn completed a *Medical Release/Physician's Statement* in which she found Mr. Cera to be temporarily disabled as of September 20, 2005 due to the compression fractures. [AR at

---

[8]  Nonprescription ibuprofen is used to relieve mild pain from, among other things, muscle aches and backaches, whereas prescription ibuprofen is used to relieve pain, tenderness, swelling, and stiffness. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000598.

[9]  Motrin is simply the generic name for ibuprofen.  See http://www.rxlist.com/ibuprofen-drug.htm.

301].  Dr. Penn limited Mr. Cera to lifting objects not heavier than five pounds. [Id.].  By contrast, on November 26, 2007, HCH's Dr. Miriam Komaromy completed a *Medical Release/Physician's Statement* in which she determined that, due to back pain, Mr. Cera was temporarily unable to work for a period of one month.  Without further explanation, Dr. Komaromy noted that Mr. Cera's condition limited him in the areas of lifting and walking. [AR at 22].

On August 9, 2006, Mr. Cera's application for disability benefits was denied. [AR at 114-117].   One week later, on August 16, 2006, Mr. Cera filed a *Request for Reconsideration*, describing himself as "totally disabled." [AR at 112].  On December 5, 2006, Mr. Cera's request for reconsideration was also denied. [AR at 109-111].  On January 22, 2007, Mr. Cera requested a hearing before an ALJ, again insisting that he was "totally unable to work due to [his] health conditions." [AR at 107].  On March 6, 2008, Mr. Cera, along with his attorney, James Rawley, appeared before the ALJ.  Also present were vocational expert ("VE") Daniel Moriarty and an interpreter.

At the hearing, Mr. Cera testified that (1) he was 44 years old; (2) had no schooling; (3) understood very little and spoke no English; and (4) was able to read "a little bit" but write nothing in Spanish. [AR at 354].  Mr. Cera repeated that he injured his back while working as a roofer for Newt & Butch's Roofing.  [AR at 360].  He described his pain as "constant," explaining that it occasionally woke him from sleep and, while it worsened with sitting, it eased some with standing. [Id.].  According to Mr. Cera, he was able to bend over only "sometimes for a very short period" because the pain he experienced while doing so was

7

"very strong." [AR at 361].  Although Mr. Cera described himself as walking "like a robot[,]" with his arms straight down at his sides, he also stated that "to walk is normal" but that "the problem is there" during any activity requiring bending. [Id.].  Although Mr. Cera testified to the constancy of his pain, he also volunteered that "[s]ometimes the pain [was] relieved. . . ." [Id.].  Still, Mr. Cera stated that he could not recall a "normal" day since the injury. [Id.].

When asked whether he worked since sustaining his injury, Mr. Cera responded that he took one odd job but did not return after the first day, because the job "was very heavy" and caused him pain that kept him awake that night. [AR at 361-362].  When asked whether he had sought other work, Mr. Cera stated that, because of the pain, he had not.  [AR at 367].  According to Mr. Cera, as of the time of the hearing, he had been homeless for three years. [AR at 362].

Mr. Cera confirmed that he was receiving care at UNMH, where doctors advised that he was not a surgical candidate and, instead, continued to treat him with painkillers, such as ibuprofen and hydrocodone.[10] [AR at 364].  Mr. Cera testified that he took three hydrocone per day, and used to take three ibuprofen as well, but that the ibuprofen upset his stomach. [AR at 364-365].  He stated that the medications relieved the pain. [AR at 365].

In addition to his back pain, Mr. Cera now also complained of problems with his hand, explaining that, when the weather became cold, one of his index fingers would turn black,

---

[10]  Hydrocodone is an opiate (narcotic) analgesic that is prescribed for the treatment and relief of moderate to severe pain.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000014.

then white.  Mr. Cera's testimony that he began to experience issues with his hand the previous December was consistent with a January 15, 2008 clinic note dictated by Dr. DeArman, in which she saw Mr. Cera pursuant to a complaint that, after exposure to cold weather, his fingers turned colors, became painful, and then turned pale. [AR at 205, 365].

When questioned as to his ability to engage in activities of daily living, Mr. Cera stated that he was able to dress himself and, if he had money, would also be able to shop for himself. [AR at 366].  He testified that he was not exactly sure how much he was able to lift, but explained that doctors recommended he not lift items heavier than seven pounds. [Id.]. When Mr. Cera estimated that he was unable to sit comfortably for more than five minutes, the ALJ pointed out that, during the hearing, Mr. Cera had been sitting for more than that amount of time, so his testimony and his actions "[were] not consistent with each other." [AR at 367].  Insisting that "the pain [was] hurting[,]" Mr. Cera asked the ALJ if she noticed that he was "leaning like this and . . . like that. . . ." [Id.].  The ALJ responded that Mr. Cera was free to stand up, but that she had not observed him to be "in a lot of discomfort." [Id.].  In response to follow-up questioning by counsel, Mr. Cera testified that while "sitting down [was] very uncomfortable[,]" he was able to "stand[] up all the time." [AR at 369].  To that end, Mr. Cera testified that, in a typical day, he walked "[a]lmost all the time." [AR at 369-370].

Vocational expert Daniel Moriarty testified next.  Mr. Moriarty explained that, in the past, Mr. Cera had worked jobs that were either unskilled and very heavy, or unskilled and heavy. [AR at 371].  Mr. Moriarty testified that Mr. Cera was unable to perform his past

work, but that there existed in the regional and national economies unskilled jobs at the medium-exertion level that a hypothetical individual[11] in Mr. Cera's situation could perform, such as hand packer, warehouse worker, and laundry worker. [AR at 372].  When asked by counsel whether any of these three jobs required an ability to speak English, the VE answered, "Language is not a key factor or even a factor in most of those jobs." [AR at 381]. He further described the work in question as "unskilled" and "labor-type work[,]" success at which depended more on production and quality than language or communication skills. [AR at 382].

Still, the VE confirmed that hand packing, warehouse working, and laundry working required the ability to bend, and that an individual who was able to bend only rarely would be foreclosed from these jobs. [AR at 382].  On the other hand, the VE noted that none of these jobs involved significant sitting, and that an individual who could not lift over 20 pounds would still be able to perform the job functions. [Id.].  According to the VE, while the three jobs he identified  required grasping; turning; and twisting; they did not require an ability to read. [AR at 382-383].

The ALJ then modified the hypothetical question, asking the VE how the job base would change if the hypothetical individual under consideration could lift and carry 20

_____

[11]  The hypothetical individual in question was of the same age, educational and vocational background as Mr. Cera and could (1) lift no more than 50 pounds occasionally and 25 pounds frequently; (2) sit and stand with normal breaks for 6 hours out of an 8-hour day; (3) push and pull with his upper and lower extremities in a manner consistent with his strength limitations; (5) occasionally climb ropes, ladders, and scaffolds; and (6) frequently balance, kneel, crouch, and crawl, as well as climb ramps and stairs.  Finally, the hypothetical individual had no manipulative limitations other than being only occasionally able to feel with his non-dominant (left) hand. [AR at 371].

pounds occasionally and 10 pounds frequently, and was limited to stooping on an occasional basis. [AR at 383].  The VE testified that such an individual would be able to perform unskilled jobs of light exertion, examples of which included small-parts assembler and food assembler, both of which existed in the regional and national economies. [AR at 384].  The VE described both jobs as requiring "very little communication[,]" since they primarily involved working with things, rather than people. [Id.].  The jobs also required frequent handling and reaching, but not fine manipulation. Finally, although both jobs "could be done either standing or sitting[, s]tanding would be the primary posture." [Id.].

On September 23, 2008, the ALJ issued a written opinion unfavorable to Mr. Cera, and denied his request for benefits. [AR at 76-85].  After finding that he met the insured status requirements of the Social Security Act through September 30, 2007, and that he had not been substantially gainfully employed since March 20, 2005, the ALJ determined that Mr. Cera suffered from a medically severe combination of the following impairments: (1) degenerative and discogenic disease of the cervical, lumbar, and thoracic spine; (2) a history of compression fracture of the T11-T12 vertebrae; (3) osteopenia; (4) a history of injury to the fourth digit on his right hand; (4) cold sensitivity of the digits on his left hand; and (5) a history of gastroesophageal reflux disease. [AR at 78].

The ALJ then found that none of Mr. Cera's impairments, either singly or in combination, met or medically exceeded a listed impairment.  Finally, the ALJ concluded that, although Mr. Cera was unable to perform his past relevant work, he retained the residual functional capacity to perform light work as described by the VE on the basis of the modified

11

hypothetical question posed to him by the ALJ.  [AR at 79, 84].

Having considered the entire record, the ALJ determined that, while Mr. Cera's medically determinable impairments could reasonably be expected to produce the complained-of symptoms, Mr. Cera's statements as to the symptoms' intensity, persistence, and limiting effects were not entirely credible. [AR at 80].

For example, the ALJ pointed to Mr. Cera's claimed inability to sit for more than five minutes, notwithstanding that, as of the point in the hearing that he so testified, he had been sitting for more than that amount of time. [AR at 80].  The ALJ also noted that, while Mr. Cera complained of "very strong" back pain, numerous X-rays and medical reports from the years 2005 through 2007 indicated a largely normal and aligned spine (though evidence of old, healed compression fractures could also be seen). [AR at 80-81].  Moreover, records indicated that Mr. Cera's pain was well controlled with Vicodin which, by the time he saw Dr. DeArman on May 19, 2008, he was taking only on an as-needed basis. [AR at 82-83]. Finally, the ALJ commented on the August 15, 2007 clinic note from Dr. Selina Silva, wherein Dr. Silva stated that Mr. Cera was "back to work," although he was experiencing difficulty.  The ALJ remarked that Mr. Cera "was not forthcoming about this at his hearing." [AR at 83].

The ALJ declined to give weight to Dr. Kilpatrick's opinions that (1) as of May 3, 2007, Mr. Cera was permanently disabled; and (2) because of a compression fracture of the T12 vertebra and a 30% loss of vertebral height, Mr. Cera was restricted from lifting objects weighing more than 10 pounds.  As an initial matter, the ALJ noted that the question of

disability is one that is reserved for the Commissioner. She then found that Dr. Kilpatrick's opinion as to Mr. Cera's compression fracture-related limitations was inconsistent with the overall medical evidence, which showed healed compression fractures and a "largely normal" thoracic and lumbar spine. The ALJ also noted that the medical evidence showed that Mr. Cera's pain was "well controlled" with Vicodin, which was proving to be "a very efficacious therapy for him." [AR at 83].

In a letter dated September 29, 2008, Mr. Cera's attorney, James Rawley, asked the Appeals Council to review the ALJ's decision on grounds that (1) the ALJ erroneously disregarded Dr. Kilpatrick's opinion that Mr. Cera was permanently disabled as of May 3, 2007; and (2) the VE's testimony failed to establish the existence of jobs that Mr. Cera was able to perform. [AR at 69]. Notwithstanding that Mr. Rawley's letter to the Appeals Council clearly bears a date of September 29, 2008, on November 10, 2009, the Appeals Council dismissed the request for review as untimely filed, explaining that the request was not made until September 14, 2009. [AR at 66-68]. Mr. Rawley thereafter suggested that any confusion as to the date of filing must have occurred when, on September 14, 2009, his office sent the Appeals Council a *copy* of his September 29, 2008 request. [AR at 9]. Unpersuaded, on December 11, 2009, the Appeals Council upheld the dismissal, concluding that (1) Mr. Rawley failed to provide evidence that his request for review was timely made; and (2) no good cause existed to extend the filing deadline. [AR at 7].

On February 3, 2010, Mr. Rawley, on Mr. Cera's behalf, filed a *Complaint for Social Security Benefits*. [Doc. 1]. Instead of filing an Answer, on October 4, 2010, the SSA filed

an *Agreed Motion to Remand Pursuant to Sentence Six*,[12] which was granted by *Order* entered October 13, 2010. [See Docs. 12, 13].  On December 22, 2010, having set aside its December 11, 2009 decision for the purpose of considering additional information, the Appeals Council again denied Mr. Cera's request for review.  [AR at 2-4].  This action had the effect of making the ALJ's decision the final decision of the Commissioner of Social Security. [AR at 2-4].

By *Order* entered February 24, 2010, this Court granted the SSA's unopposed motion to reopen Mr. Cera's case. [See Docs. 15, 16].  On May 27, 2011, Mr. Cera, through Mr. Rawley, filed the *Motion and Memorandum of Law in Support of Motion to Remand Administrative Decision* that is now before the undersigned Magistrate Judge for a recommended disposition.[13]

## II.   ANALYSIS

### A.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the denial of benefits to Mr. Cera only if it determines that the denial is (1) not supported by substantial evidence; or (2) based on legal error.  See Krauser v. Astrue, 638 F.3d 1324, 1326 (10th Cir. 2011). "Substantial evidence is such relevant evidence as a reasonable mind might accept as

---

[12]  Pursuant to 42 U.S.C. § 405(g) the Court may order a "sentence six" remand without first ruling on the merits of the case if (1) the Secretary requests remand, for good cause, prior to filing his answer; or (2) new and material evidence comes to light, and there is good cause for failing to incorporate such evidence in the earlier proceeding.  Nguyen v. Shalala, 43 F.3d 1400, 1403 (10th Cir. 1994).

[13]  The parties filed Rule 73(b)(1) consents, but those consents were filed one day past the March 28, 2011 deadline and, quite literally, minutes before this matter was reassigned to United States District Judge Martha Vazquez and United States Magistrate Judge Lorenzo F. Garcia. [See Docs. 17, 23-25].

adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Raymond v. Astrue, 621 F.3d 1269, 1271-72 (10th Cir. 2009) (internal quotations omitted). By contrast, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). A finding of "no substantial evidence" should be made "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992) (quoting Hames v. Heckler, 707 F.2d 162, 164 (5th Cir.1983) ).

In order to determine whether a decision is supported by substantial evidence, the Court must "meticulously" examine the record as a whole. Musgrave, 966 F.2d at 1374. Importantly, however, the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. Adams ex rel. D.J.W. v. Astrue, 659 F.3d 1297, 1301 (10th Cir. 2011). Put differently,

> [t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] findings from being supported by substantial evidence. [This Court] may not displace the [ALJ's] choice between two fairly conflicting views, even though the [C]ourt would justifiably have made a different choice had the matter been before it de novo.

Cowan v. Astrue, 552 F.3d 1182, 1185 (10th Cir. 2008) (quoting Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir.2007)). This Court's task is to "review only the *sufficiency* of the evidence, not its weight. . . ." Oldham v. Astrue, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original).

In assessing whether a claimant is disabled,[14] the ALJ is required to follow a five-step sequential evaluation process, with the claimant shouldering the burden of establishing a prima facie case of disability at steps one through four.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).  At step one, the claimant must demonstrate that he is not presently engaged in substantial gainful activity.  Step two requires the claimant to show that he has a medically severe impairment or combination of impairments.  If, at step three, the claimant shows that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits.  If the claimant cannot meet a listing at step three, he continues to step four, which requires him to show that the impairment (or combination of impairments) prevents him from performing his past work.  If the claimant satisfies his burden, the burden of proof shifts to the Commissioner at step five "to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the national economy, given his age, education, and work experience."  Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005).

While the record must demonstrate that the ALJ *considered* all of the evidence, the ALJ is not required to *discuss* every piece of evidence.  Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Instead, the ALJ must discuss the evidence that supports her decision, as well as any uncontroverted evidence she chooses not to rely upon, and significantly probative evidence she rejects.  Id. at 1010.  Additionally, while the ALJ must

---

[14]  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §§ 423(d)(1)(A).

provide an evidentiary discussion and explanation of reasoning sufficient to enable meaningful judicial review, she need not employ any "magic" words, nor must she use any particular language or adhere to a particular format in conducting her analysis.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3rd Cir. 2009).  With these legal principles as a framework, the Court now turns to Mr. Cera's motion.

**B.**     **Mr. Cera's *Motion and Memorandum of Law in Support of Motion to Remand Administrative Decision* [Doc. 30]**

**1.**     **Mr. Cera's Assertion that a "Sentence Six" Remand is Appropriate**

Mr. Cera raises two issues in his motion to remand.  First, he argues that a second "sentence six" remand is justified because he is now in possession of "additional medical information and evidence" that was not available at the time the ALJ issued her decision on September 23, 2008. [Doc. 30 at 2, 4].  This additional information is described as: (1) a December 4, 2009 letter from Mr. Cera's treating physician, Dr. Tim Wilcox, containing "additional medical information [that] contradicts several of the ALJ's findings[;]" (2) a February 10, 2010 comprehensive psychological evaluation conducted by Eligio R. Padilla, Ph.D., and allegedly showing Mr. Cera's "serious mental disabilities[;]" (3) a May 18, 2010 consultative examination performed by physicians at the New Mexico Department of Vocational Rehabilitation ("DVR"), the findings from which "tend to contradict the residual functional capacity [determination] of the ALJ[;]" (5) a September 9, 2010 letter from Martha Jaramillo, a rehabilitation technician with the DVR, in which Ms. Jaramillo explains that Mr. Cera's learning disabilities prevent his participation in vocational rehabilitation and

educational programs; and (6) a November 9, 2010 *Discharge Treatment Plan* from UNMH that, because it recommends physical therapy for Mr. Cera, "tends to contradict the findings of the ALJ." [Id. at 2-3].

Section 405 of Title 42 of the United States Code contemplates two types of remands in Social Security cases.  See Sullivan v. Finkelstein, 496 U.S. 617, 623-629 (1990).  As is relevant here, the sixth sentence of 42 U.S.C. § 405(g)  provides, in pertinent part, that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ."  42 U.S.C. § 405(g).  When a court remands pursuant to sentence six, it

> does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding.

Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991).

For purposes of a "sentence six" remand, however, evidence is considered material only if it is "relevant to the claimant's condition *during the time period* for which benefits were denied. . . ."  Chubbuck v. Astrue, 2011 WL 2446308, *1 (D.Conn. June 17, 2011) (emphasis added); see also Wilson v. Astrue, 2011 WL 3924862, *4 (S.D.Miss. Aug. 15, 2011) (to be deemed material for "sentence six" remand, evidence must relate to time period for which benefits were denied); Kuperman v. U.S. Soc. Sec. Admin., Comm'r, 2008 WL

4159152, *3 (D.N.H. Sept. 9, 2008) (same).  "Material" evidence is evidence that might reasonably have caused the ALJ to issue a different opinion, had the new evidence been before her at the relevant time.  See Wilson v. Astrue, 602 F.3d 1136, 1148 (10th Cir. 2010). By contrast, evidence of a later-acquired disability, or even of the subsequent deterioration of a previously non-disabling condition, may provide a basis for a new application for disability benefits, but does not justify a "sentence six" remand.  See Williams v. Barnhart, 178 Fed.Appx. 785, 792 n.5 (10th Cir. 2006); accord Leggett v. Chater, 67 F.3d 558, 566-567 (5th Cir. 1995).

In this case, the alleged "additional medical information and evidence" proffered by Mr. Cera cannot be deemed "material" for purposes of sentence six of 42 U.S.C. § 405(g) because not one item or piece of information or evidence relates to the time period for which benefits were denied, *to wit*, the three and one-half years between March 20, 2005 (date of onset) and September 23, 2008 (date of unfavorable decision).  To the contrary, the earliest date shown on any of Mr. Cera's pieces of additional information submitted is December 4, 2009, which is more than one year after the ALJ issued her decision denying benefits. [See Doc. 30 at 2; see also AR at 85].  The burden is on Mr. Cera to demonstrate that his alleged current condition and disabilities relate back to the period of time under review, as opposed to (1) having developed after he applied for benefits; or (2) indicating the deterioration of a condition that the ALJ previously found to be not disabling.  See Williams, 178 Fed.Appx. at 792; Leggett, 67 F.3d at 567.  Mr. Cera's evidence does not satisfy this burden.

Additionally, Mr. Cera does not show good cause for not having presented his "additional medical information and evidence" during his hearing before the ALJ.  As an initial matter, the Court notes that Mr. Cera does not even address the "good cause" requirement, positing instead that "[a] claimant need not show 'good cause' before submitting the new evidence *to the Appeals Council*." [Doc. 34 at 2 (emphasis added)]. While this may be true when a claimant, pursuant to 20 C.F.R. § 404.970,[15] asks the Appeals Council to review an unfavorable decision of the ALJ, Mr. Cera expressly moves for a "sentence six" remand. [See Doc. 30 at 4 ("A sentence-six remand is appropriate in this case

---

[15]  Section 404.970 details the circumstances under which the Appeals Council is to review a decision of the ALJ and provides:

> (a) The Appeals Council will review a case if--
>
> (1) There appears to be an abuse of discretion by the administrative law judge;
>
> (2) There is an error of law;
>
> (3) The action, findings or conclusions of the administrative law judge are not supported by substantial evidence; or
>
> (4) There is a broad policy or procedural issue that may affect the general public interest.
>
> (b) If new and material evidence is submitted, the Appeals Council *shall* consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council *shall* evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It *will* then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970 (emphasis added).

as additional information and medical evidence has been adduced since the time of the ALJ's decision.")].   The Fourth Circuit case upon which Mr. Cera relies supports as much, specifically confirming that

> [a] claimant seeking a remand on the basis of new evidence under . . . § 405(g) . . . must show that the evidence is new and material *and must establish good cause for failing to present the evidence earlier*[, although t]here is no requirement that a claimant show good cause when seeking to present new evidence before the Appeals Council.

Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 n.3 (4th Cir. 1991) (emphasis added).   Just as important, however, is the fact that "[a] claimant does not meet the good cause requirement by merely obtaining a more favorable report once his . . . claim has been denied."   Mayes v. Massanari, 276 F.3d 453, 463 (9th Cir. 2001).   Instead, he must demonstrate that his new evidence was unavailable earlier.   Id.   In this case, Mr. Cera has failed to make such a showing.   For the above-stated reasons, Mr. Cera has not met his burden of showing that a "sentence six" remand is proper here.

## 2.   Mr. Cera's Argument that the ALJ Should Have Given Controlling Weight to Dr. Kilpatrick's Opinion as to Permanent Disability

For his second argument in support of remand, Mr. Cera contends that the ALJ should have accorded controlling weight to the opinions of Dr. Kilpatrick, to whom Mr. Cera refers as his "treating physician."   [Doc. 30 at 4-6].   According to Mr. Cera, "[t]he ALJ's refusal to give any weight . . . at all to Dr. Kilpatrick's opinions" goes against "the overwhelming majority" of the medical evidence, as well as Mr. Cera's testimony, and stands in contradiction to other parts of the ALJ's own decision. [Id. at 5].   Had the ALJ credited Dr.

Kilpatrick's opinions, continues Mr. Cera, she would necessarily then have had to find him disabled, with a residual functional capacity of "less than sedentary," if not "sedentary." [Id. at 5-6].

In response, the SSA argues that (1) Dr. Kilpatrick should not be considered a "treating physician" whose opinions are entitled to controlling weight; (2) the ALJ properly weighed Dr. Kilpatrick's opinions and provided reasons for assigning them no weight; and (3) the ALJ correctly disregarded Dr. Kilpatrick's opinion that Mr. Cera was permanently disabled, as such an opinion is not a medical opinion but, instead, a determination reserved to the Commissioner.  [See Doc. 31 at 7-10].

"Under the 'treating physician rule,' the Commissioner will generally give greater weight to the opinions of sources of information who have treated the claimant than of those who have not."  Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005).  The Code of Federal Regulations explains that

> [t]reating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your

> relationship with the source is not based on your medical need
> for treatment or evaluation, but solely on your need to obtain a
> report in support of your claim for disability. In such a case, we
> will consider the acceptable medical source to be a nontreating
> source.

20 C.F.R. § 404.1502.

The opinion of a treating physician concerning the nature and extent of a claimant's disability is entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  By contrast, the ALJ may disregard a treating physician's opinion that is not so supported, id., or "if other assessments are supported by better or more thorough medical evidence."  Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997).  The reasoning behind the "treating physician rule" is that, as a result of a patient-physician relationship evincing both duration and frequency, the physician is able to bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  See 20 C.F.R. § 416.927(d)(2).  Additionally, "a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits."  Doyal, 331 F.3d at 762-763.

Under certain circumstances, the Regulations contemplate recognizing as a treating source a provider "who has treated or evaluated [the claimant] only a few times or only after long intervals. . . ." 20 C.F.R. § 404.1502.  Notwithstanding, courts have rejected as "treating

sources" providers who saw a claimant only twice, and only sporadically.  See, e.g., Bricker v. Astrue, 2010 WL 1257919 *8 (W.D.Mo. Mar. 26, 2010); Branson v. Callahan, 14 F.Supp.2d 1089, 1098 (N.D.Iowa 1998).  To be sure, in a situation not unlike that presented here, the court in Branson affirmed the ALJ's rejection of the opinion of a physician that the claimant had seen only twice—first in September 1992, and then in November 1994—for a degenerative disc in her back.  As the court explained, seeing this doctor only twice in over two years was "inconsistent with the type of treatment and evaluation required for the supposedly intense pain suffered by plaintiff from the degenerative disc."  Branson, 14 F.Supp. at 1098.  Equally important, however, was "the fact that [the claimant] saw two other doctors . . . for the same problem more often, yet the record d[id] not show that these physicians thought [the claimant] was disabled."  Id.

    At first blush, then, Branson would seem to supply the "answer" here—Dr. Kilpatrick saw Mr. Cera only three times, and deemed him permanently disabled.  But Dr. DeArman saw Mr. Cera six times and did not find him permanently disabled.[16]  [Compare AR at 198, 200, 202, 214, 217, 220 with AR at 257].  To the contrary, the record reveals that Dr. DeArman concluded, among other things, that, notwithstanding his chronic back pain: (1)Mr. Cera was "well controlled" with Vicodin; (2) Vicodin had been "a very efficacious" therapy

---

[16]  On April 18, 2008, however, Dr. DeArman did complete a *Provider's Statement/Medical Release* indicating that, as of May 3, 2004, Mr. Cera was unable to work due to a compression fracture of the T12 vertebra.  The anticipated duration of Mr. Cera's inability to work was noted as "unknown." [AR at 21].  Dr. DeArman completed this release even though she stated in a December 7, 2007 clinic note that she advised Mr. Cera that, because she was not a disability counselor, she was unable to fill out disability-insurance forms he brought to his appointment and presented to her. [AR at 218].

for him; and (3) as of May 19, 2008, Mr. Cera no longer required Vicodin around-the-clock but, instead, was using it on an as-needed basis.  [AR at 198, 200].  Following the Branson reasoning, then, it would have been reasonable for the ALJ to infer that Mr. Cera designated Dr. Kilpatrick his treating physician not because of any longstanding patient-doctor relationship the pair had formed but, instead, "to facilitate the obtaining of benefits."  Doyal, 331 F.3d at 762-763.

But the critical difference this Court sees between the facts in Branson and those presented here is indigence.  While there is no indication that the claimant in Branson lacked resources, it is undisputed that, at all relevant times, Mr. Cera faced a dire financial situation. In addition to losing his home when he lost his job (necessitating care from HCH), a *Social Assessment/Intake for Clinic Advocates* form dated April 17, 2006 indicates that, as of that point in time, Mr. Cera was living under a bridge. [AR at 287].  There also is evidence in the record tending to demonstrate that his lack of resources caused Mr. Cera to ration his medications. [AR at 135 ("Sometimes due to no money, I take only a few pills or none.")].

Indigence of the Social Security claimant should not be understated.  To be sure, in a 1985 issue of The Administrative Law Review, Charles K. Barber discusses the fact that "[d]espite the importance of testimony from treating physicians, attempts to secure such evidence on behalf of indigent claimants are severely restricted by the system of health care delivery for the poor."  Charles K. Barber, *Social Security Disability Hearings: Securing Additional Medical Evidence for the Indigent Claimant*, 37 Admin. L. Rev. 479, 482 (1985). Mr. Barber continues:

25

> Persons in need of health care who are unable to afford a private physician generally look to the emergency wards of public hospitals or to neighborhood clinics. The trend towards greater use of hospital based ambulatory care, particularly in large urban centers, severely handicaps the disability claimant since care in such situations is parcelled out among many health practitioners in several specialty clinics. A single, responsible physician often cannot be located because no one physician has been assigned that role.

Id. This fractured service is the consequence of "patients in many clinics [being] treated by a revolving series of doctors on a first come, first served basis which results in no single health care practitioner gaining a comprehensive view of the condition of the patient." Id. at 483.

Being both jobless and homeless, Mr. Cera's health-care options were accordingly limited. As a result, he sought care from Albuquerque's Healthcare for the Homeless, which expresses as part of its mission "to provide caring and comprehensive health and integrated supportive services, linking people experiencing homelessness to individual and collective solutions,"[17] and at one of UNMH's Family and Community Practice clinics, which similarly aspires to, among other things, "improv[e] the health of New Mexico and particularly in underserved communities and with underserved individuals."[18] Out of necessity and because of systemic constraints, Mr. Cera saw a number of "treating physicians." Thus, the Court

---

[17] See http://abqhch.org/about-2/mission-vision.

[18] See UNIVERSITY OF NEW MEXICO SCHOOL OF MEDICINE, DEPARTMENT OF FAMILY AND COMMUNITY MEDICINE, ANNUAL REPORT JULY 1, 2010 - JUNE 30, 2011 at 6 (2011) (available at http://hsc.unm.edu/som/fcm/).

concludes that, for purposes of the "treating physician" rule, Mr. Cera's indigence, and the consequent difficulty—if not impossibility—in establishing a patient-physician relationship with a single primary care provider, is a critical factor that the ALJ should have considered in assessing the weight to give Dr. Kilpatrick's opinion as to Mr. Cera's limitations.

As a final matter, the Court notes that "[a] medical source opinion that [a claimant] is 'disabled' or 'unable to work,' [is] an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the [ALJ] gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). In fact, "[t]reating source opinions on issues reserved to the Commissioner are *never entitled to controlling weight or special significance*." Krauser, 638 F.3d at 1332 (emphasis added). Still,

> [a]lthough some determinations, such as disability . . . , are legally reserved for the Commissioner, Social Security guidelines require adjudicators making these determinations to consider the opinions of medical sources and "apply the applicable factors" denoted in the regulations when weighing the opinions. These factors are: 1) the physician's length of treatment of the claimant; 2) the frequency of examination; 3) the nature and extent of the treatment relationship; 4) the extent to which the physician's opinion is supported by the medical record; 5) the consistency of the opinion with the record as a whole; and 6) the specialization of the treating physician.

Giles v. Astrue, 433 Fed.Appx. 241, 247 (5th Cir. 2011). Thus, even though she correctly disregarded Dr. Kilpatrick's ultimate opinion as to disability, the ALJ should nevertheless have considered Dr. Kilpatrick's underlying medical opinions in support of that conclusion.

The Court further finds that the hypothetical questions the ALJ posed to the VE were flawed in two respects. In the first hypothetical, the ALJ asked the VE to consider an

individual who was able to, among other things, "lift no more than 50 pounds occasionally [and] 25 pounds frequently. . . ." [AR at 371]. In her modified hypothetical, the ALJ asked the VE to consider that the individual in question "could lift and carry . . . no more than 20 pounds occasionally and 10 pounds frequently. . . ." [AR at 383]. Even ignoring Dr. Kilpatrick's opinion that Mr. Cera was restricted from lifting items weighing more than 10 pounds, there was other medical evidence in the record tending to show that Mr. Cera should not lift items weighing more than 15 (according to Dr. DeArman) or even 5 (Dr. Penn) pounds. [AR at 21, 301].

The second problem with the ALJ's hypothetical questions is that, while not truly inaccurate (and certainly not incorrect), they could more precisely have captured Mr. Cera's situation had the ALJ not played down his illiteracy and complete inability to speak English. [AR at 354 ("Q: Okay, are you able to read or write in English? A: No, nothing.")].

As defined by the Regulations,

> [i]lliteracy means the inability to read or write. [The SSA will] consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. § 416.964(b)(1). The Court can find nothing in the record to dispute Mr. Cera's assertion that he can neither read nor write in the English language. Mr. Cera confirmed this particular limitation when questioned directly by the ALJ. [AR at 354]. Yet "[i]t is well settled that the hypothetical question[s] posed to the VE must precisely reflect all, but only, the impairments and limitations borne out by the record." Barber v. Astrue, 431 Fed.Appx.

709, 713 (10th Cir. 2011) (*citing* <u>Decker v. Chater</u>, 86 F.3d 953, 955 (10th Cir.1996)).  Here,

although *Mr. Rawley* asked the VE whether it would "affect the number of jobs available in

New Mexico [if] a worker could speak the English language or not[,]" [AR at 381], the Court

concludes that neither hypothetical question *posed by the ALJ* adequately (or at all) took into

account either Mr. Cera's inability to read or write in English, or his testimony that he did

not have even one single year of schooling. [AR at 354 ("Q: Okay, and how far did you go

in school, Mr. Cera? A: I don't have neither a year.")].  Instead, the ALJ should have more

explicitly questioned the VE as to the abilities of a hypothetical individual who, in addition

to possessing the same background and being limited in the same ways as Mr. Cera, also was

illiterate.  <u>Contra</u> <u>Hicks v. Chater</u>, 1996 WL 621960, *2 (10th Cir. Oct. 28, 1996) ("Insofar

as claimant attempts to assert that the ALJ should have considered illiteracy as an additional

limiting impairment, the record is lacking in any indication that claimant asserted illiteracy

as an impairment impacting his ability to work.").

## III.   CONCLUSION

On the basis of the foregoing, it is the recommendation of the undersigned Magistrate

Judge that Plaintiff Socorro Olivas Cera's *Motion and Memorandum of Law in Support of*

*Motion to Remand Administrative Decision* [Doc. 30] be granted, and that this matter be

remanded for further administrative proceedings.

*Lorenzo F. Garcia* 12/14/2011
Lorenzo F. Garcia
United States Magistrate Judge