IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


SOCORRO OLIVAS CERA,

      Plaintiff,

                                     No. CIV 10-92 MV/LFG

vs.

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

      Defendant.


MAGISTRATE JUDGE'S AMENDED[1] ANALYSIS
AND RECOMMENDED DISPOSITION[2]


      **THIS MATTER** comes before the Court on Plaintiff Socorro Olivas Cera's *Motion and Memorandum of Law in Support of Motion to Remand Administrative Decision* [Doc. 30], filed May 27, 2011.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court recommends granting the motion.

---

     [1] The undersigned Magistrate Judge amends the previously filed recommendations that proposed remanding this case for additional evaluation of the treating physician's opinion.  While the result remains the same, the Magistrate Judge amends its analysis as to why the ALJ's discussion of the treating physician was either erroneous or unsupported by substantial evidence.  The Court does not modify its recitation of the legal standard, Mr. Cera's medical treatment, or the analysis regarding Mr. Cera's request for a sentence six remand.  Those portions of the recommendations are unchanged.  Clearly, both parties can file objections with respect to these amended recommendations in accordance with n.2

     [2] Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the 14-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.  See, e.g., Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).

I.      **BACKGROUND**

The following facts are taken from the administrative record, which was lodged with the Court on March 9, 2011, following the September 23, 2010 filing of Mr. Cera's *Complaint* against the Social Security Administration ("SSA"), and the SSA's March 8, 2011 filing of its *Answer*. [See Docs. 1, 18, 19].

The plaintiff in this matter, Socorro Olivas Cera, was born on January 25, 1964, and, accordingly, was 44 years old when he appeared on March 6, 2008 for a hearing before an Administrative Law Judge ("ALJ") on his claim for disability insurance benefits.

Approximately two years prior to the hearing, on May 30, 2006, Mr. Cera filed his application for benefits with a protected filing date of March 20, 2005, alleging disability as a result of (1) a spinal compression fracture of the T11 and T12 vertebrae;[3] and (2) osteopenia.[4] In response to a question in the application asking how these conditions limited his ability to work, Mr. Cera wrote, "Unable to lift[.] I have back pain.  It hurts me a lot.  Cannot lift over 5 lbs." [AR at 177].

In addition to applying for disability insurance benefits, Mr. Cera also sought workers' compensation.  In testimony he provided to the State of New Mexico Workers' Compensation Administration, Mr. Cera explained that he was working for Newt & Butch's Roofing in Taos, New Mexico when he lifted a bucket of tar, "something popped[,]" and the back pain began.  [AR at 153]. While Mr. Cera contends that he became unable to work on March 20, 2005, he states that he did

_____

[3]  The T11 and T12 vertebrae are located at the bottom of the thoracic spine.  According to information available on the web site of the University of Maryland Medical Center, compression fractures of the spine usually occur in that area.  See http://www.umm.edu/spinecenter/education/compression_fracture.htm.

[4]  Osteopenia is a condition where bone mineral density ("BMD") is lower than normal peak BMD but not low enough to be classified as the progressive disease of osteoporosis.  See http://www.webmd.com/osteoporosis/tc/osteopenia-overview.

not actually stop working until August 15, 2005. [AR at 177].  Notwithstanding, in the section of

his application reserved for additional remarks, he wrote that he "d[id] not recall the exact date of

[his] injury [and] continued to work until [he] was let go about August or September." [AR at 181].

In any event, prior to working as a roofer, a job he held from 2002 until 2005, Mr. Cera worked as

a meat-packing processor; a laborer; and a digger for a cable communications company. [AR at

177].

Through his *Disability Report*, Mr. Cera explained that his position as a roofer required him

to use machines; tools; and equipment, and to lift and carry garbage and boxes of tar "about 2-3 feet

once to twice a day." [AR at 178].  He also was required to walk, stand, stoop, and handle both large

and small objects. [Id.].  In his *Disability Report*, Mr. Cera wrote that the heaviest weight he lifted

was 50 pounds, and the weight he frequently lifted (in one-third to two-thirds of his workday) was

10 pounds. [AR at 178].

By contrast, at the hearing before the ALJ, Mr. Cera described roofing as "very heavy" work.

He testified that he lifted rolls weighing "more than 100 pounds[,]" and that it was while he was

lifting one of these 100-pound rolls that he injured his back.  [AR at 356].  When asked whether he

was required to lift buckets of tar, further described for him as "[t]he black gooey stuff[,]" Mr. Cera

responded, "I don't know what that is." [Id.].

The *Disability Report* reveals that Mr. Cera received care for his back injury (1) at the

University of New Mexico Health Sciences Center ("UNMH"); (2) from the Lovelace Sandia

Health System; and (3) because he lost his home when he lost his job, at Albuquerque's Healthcare

for the Homeless ("HCH").  [AR at 179, 181, 243-244].  He denied that he ever saw a doctor for

emotional or mental problems that limited his ability to work. [AR at 179].

Medical records from UNMH dating from October 21, 2005 through May 19, 2008 show that Mr. Cera was seen by a number of physicians there, including, as is relevant here, Craig J. Kilpatrick, M.D.[5] [AR at 257-260]. Dr. Kilpatrick's clinic notes show that, on February 19, 2007, he saw Mr. Cera "for continued evaluation of back pain[, having] seen the patient twice before for the same complaint. . . ." [AR at 257]. The immediately preceding visit occurred one week prior, but the initial visit took place about one and one-half years earlier. X-rays taken during the initial UNMH visit were negative for a fracture, [see AR at 337],[6] but because Mr. Cera continued to complain of persistent lower thoracic pain, X-rays were repeated. This second round of testing, according to Dr. Kilpatrick, "revealed a compression fracture of the T12 vertebral body with approximately 30% loss of the vertebral body height." [Id.]. Dr. Kilpatrick recommended that Mr. Cera fill the Naprosyn[7] and Vicodin[8] prescriptions that he had been given during his last appointment but that he was unable to obtain at that time given his lack of financial resources. [Id.]. In a *Medical Release/Physician's Statement* provided to him by the Department of Human Service

---

[5] Among the other providers Mr. Cera saw at UNMH's Family Practice Clinic were Maryanne Clark, Selina Silva, Maria DeArman, and John Leggott. [AR at 198, 200, 202, 205, 214, 217, 220, 222, 261, 325].

[6] A report from UNMH's radiology department, dated October 21, 2005, indicates that "AP and lateral views of the thoracic spine demonstrate normal alignment with no evidence of compression fracture. . . ." [AR at 337]. On the other hand, a September 20, 2005 radiology report from the Albuquerque Regional Medical Center noted that the "slight loss of height above [Mr. Cera's] T11 and T12 . . . probably represent[] compression fractures." [AR at 297]. Additionally, a clinic note from August 15, 2007 indicated that X-rays revealed T11 and T12 compression fractures that had healed. [AR at 224].

[7] Naprosyn (naproxen) is used to relieve pain, tenderness, swelling, and stiffness. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526.

[8] Vicodin is a narcotic pain reliever combining acetaminophen and hydrocodone and is used to relieve moderate to severe pain. See http://www.drugs.com/vicodin.html. Vicodin is classified as a Schedule III controlled substance. See http://www.opiates.com/vicodin.

Income Support Division and completed on May 3, 2007, Dr. Kilpatrick deemed Mr. Cera to be

permanently disabled, and restricted him from lifting objects weighing more than 10 pounds.  Dr.

Kilpatrick's diagnosis was "T12 compression fracture [with] loss of 30% of vertebral height."  [AR

at 268].

Notwithstanding Dr. Kilpatrick's assessment, a clinic note dictated on August 15, 2007 by

UNMH's Dr. Selina Silva reveals that "[t]he patient is a roofer and he is back to work but he has

been having difficulties."  [AR at 224].  Dr. Silva also remarked that

> [u]pon physical exam the patient has point tenderness over his lower
> thoracic spine.  Otherwise, he has no tenderness to palpation.  He is
> sensory intact from L3 to S1 and motor intact with 5 out of 5 strength
> from L3 to S1.  His strength is 5 out of 5 and he has a normal gait.
> He is able to tandem gait walk and is able to toe walk and heel walk
> with no problems.

[Id.].  Dr. Silva told Mr. Cera that he might "at some point need some form of vocational

rehabilitation as roofing may not be a great job for him as it may cause him continued back pain."

[Id.].  Dr. Silva prescribed Vicodin, which she noted "seem[ed] to be controlling [Mr. Cera's] pain

well." [Id.].

Additional UNMH medical records show that, as of December 3, 2007, Mr. Cera had

received Vicodin on at least six different occasions. [AR at 217].  However, during his December

3, 2007 examination, Mr. Cera told his provider, Dr. Maria DeArman, that he was taking over-the-

counter ibuprofen[9] and Motrin,[10] and that the Motrin kept his back pain under control. [Id.].  Dr.

---

[9]  Nonprescription ibuprofen is used to relieve mild pain from, among other things, muscle aches
and backaches, whereas prescription ibuprofen is used to relieve pain, tenderness, swelling, and stiffness.
See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000598.

[10]  Motrin is simply the generic name for ibuprofen.  See http://www.rxlist.com/ibupro-
fen-drug.htm.

DeArman's notes indicate that, at that time, Mr. Cera was not on any controlled substances, and also that results of a urinalysis, done to determine whether Mr. Cera was taking his medications as scheduled, were negative. [AR at 217-218]. However, Dr. DeArman restarted Mr. Cera on Vicodin on January 25, 2008, calling it "a very efficacious therapy for him" and also noting that Mr. Cera was "well controlled with Vicodin." [AR at 198, 200]. In a *Provider's Statement/Medical Release* that she filled out on April 18, 2008, Dr. DeArman explained that, as a result of his T12 compression fracture, Mr. Cera was unable to work as of May 3, 2004, although the anticipated duration of this inability to work was "unknown." Dr. DeArman restricted Mr. Cera to lifting objects weighing not more than 15 pounds. [AR at 204].

Records from Healthcare for the Homeless, where Mr. Cera was seen during the year 2006, similarly document his reports of chronic back pain, as well as repeated requests for pain medications. HCH providers noted a compression fracture at T11 and T12 and prescribed ibuprofen for Mr. Cera. [AR at 317-321]. On April 18, 2006, HCH's Dr. Sandra Penn completed a *Medical Release/Physician's Statement* in which she found Mr. Cera to be temporarily disabled as of September 20, 2005 due to the compression fractures. [AR at 301]. Dr. Penn limited Mr. Cera to lifting objects not heavier than five pounds. [Id.]. By contrast, on November 26, 2007, HCH's Dr. Miriam Komaromy completed a *Medical Release/Physician's Statement* in which she determined that, due to back pain, Mr. Cera was temporarily unable to work for a period of one month. Without further explanation, Dr. Komaromy noted that Mr. Cera's condition limited him in the areas of lifting and walking. [AR at 22].

On August 9, 2006, Mr. Cera's application for disability benefits was denied. [AR at 114-117]. One week later, on August 16, 2006, Mr. Cera filed a *Request for Reconsideration*, describing himself as "totally disabled." [AR at 112]. On December 5, 2006, Mr. Cera's request for

6

reconsideration was also denied. [AR at 109-111].  On January 22, 2007, Mr. Cera requested a

hearing before an ALJ, again insisting that he was "totally unable to work due to [his] health

conditions." [AR at 107].  On March 6, 2008, Mr. Cera, along with his attorney, James Rawley,

appeared before the ALJ.  Also present were vocational expert ("VE") Daniel Moriarty and an

interpreter.

At the hearing, Mr. Cera testified that (1) he was 44 years old; (2) had no schooling; (3)

understood very little and spoke no English; and (4) was able to read "a little bit" but write nothing

in Spanish. [AR at 354].  Mr. Cera repeated that he injured his back while working as a roofer for

Newt & Butch's Roofing.  [AR at 360].  He described his pain as "constant," explaining that it

occasionally woke him from sleep and, while it worsened with sitting, it eased some with standing.

[Id.].  According to Mr. Cera, he was able to bend over only "sometimes for a very short period"

because the pain he experienced while doing so was "very strong." [AR at 361].  Although Mr. Cera

described himself as walking "like a robot[,]" with his arms straight down at his sides, he also stated

that "to walk is normal" but that "the problem is there" during any activity requiring bending. [Id.].

Although Mr. Cera testified to the constancy of his pain, he also volunteered that "[s]ometimes the

pain [was] relieved. . . ." [Id.].  Still, Mr. Cera stated that he could not recall a "normal" day since

the injury. [Id.].

When asked whether he worked since sustaining his injury, Mr. Cera responded that he took

one odd job but did not return after the first day, because the job "was very heavy" and caused him

pain that kept him awake that night. [AR at 361-362].  When asked whether he had sought other

work, Mr. Cera stated that, because of the pain, he had not.  [AR at 367].  According to Mr. Cera,

as of the time of the hearing, he had been homeless for three years. [AR at 362].

Mr. Cera confirmed that he was receiving care at UNMH, where doctors advised that he was not a surgical candidate and, instead, continued to treat him with painkillers, such as ibuprofen and hydrocodone.[11] [AR at 364].  Mr. Cera testified that he took three hydrocone per day, and used to take three ibuprofen as well, but that the ibuprofen upset his stomach. [AR at 364-365].  He stated that the medications relieved the pain. [AR at 365].

In addition to his back pain, Mr. Cera now also complained of problems with his hand, explaining that, when the weather became cold, one of his index fingers would turn black, then white.  Mr. Cera's testimony that he began to experience issues with his hand the previous December was consistent with a January 15, 2008 clinic note dictated by Dr. DeArman, in which she saw Mr. Cera pursuant to a complaint that, after exposure to cold weather, his fingers turned colors, became painful, and then turned pale. [AR at 205, 365].

When questioned as to his ability to engage in activities of daily living, Mr. Cera stated that he was able to dress himself and, if he had money, would also be able to shop for himself. [AR at 366].  He testified that he was not exactly sure how much he was able to lift, but explained that doctors recommended he not lift items heavier than seven pounds. [Id.].  When Mr. Cera estimated that he was unable to sit comfortably for more than five minutes, the ALJ pointed out that, during the hearing, Mr. Cera had been sitting for more than that amount of time, so his testimony and his actions "[were] not consistent with each other." [AR at 367].  Insisting that "the pain [was] hurting[,]" Mr. Cera asked the ALJ if she noticed that he was "leaning like this and . . . like that. . . ." [Id.].  The ALJ responded that Mr. Cera was free to stand up, but that she had not observed him

---

[11]  Hydrocodone is an opiate (narcotic) analgesic that is prescribed for the treatment and relief of moderate to severe pain.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000014.

to be "in a lot of discomfort." [Id.].  In response to follow-up questioning by counsel, Mr. Cera

testified that while "sitting down [was] very uncomfortable[,]" he was able to "stand[] up all the

time." [AR at 369].  To that end, Mr. Cera testified that, in a typical day, he walked "[a]lmost all the

time." [AR at 369-370].

      Vocational expert Daniel Moriarty testified next.  Mr. Moriarty explained that, in the past,

Mr. Cera had worked jobs that were either unskilled and very heavy, or unskilled and heavy. [AR

at 371].  Mr. Moriarty testified that Mr. Cera was unable to perform his past work, but that there

existed in the regional and national economies unskilled jobs at the medium-exertion level that a

hypothetical individual[12] in Mr. Cera's situation could perform, such as hand packer, warehouse

worker, and laundry worker. [AR at 372].  When asked by counsel whether any of these three jobs

required an ability to speak English, the VE answered, "Language is not a key factor or even a factor

in most of those jobs." [AR at 381].  He further described the work in question as "unskilled" and

"labor-type work[,]" success at which depended more on production and quality than language or

communication skills. [AR at 382].

      Still, the VE confirmed that hand packing, warehouse working, and laundry working required

the ability to bend, and that an individual who was able to bend only rarely would be foreclosed

from these jobs. [AR at 382].  On the other hand, the VE noted that none of these jobs involved

significant sitting, and that an individual who could not lift over 20 pounds would still be able to

---

[12]  The hypothetical individual in question was of the same age, educational and vocational
background as Mr. Cera and could (1) lift no more than 50 pounds occasionally and 25 pounds
frequently; (2) sit and stand with normal breaks for 6 hours out of an 8-hour day; (3) push and pull with
his upper and lower extremities in a manner consistent with his strength limitations; (4) occasionally
climb ropes, ladders, and scaffolds; and (5) frequently balance, kneel, crouch, and crawl, as well as climb
ramps and stairs.  Finally, the hypothetical individual had no manipulative limitations other than being
only occasionally able to feel with his non-dominant (left) hand. [AR at 371].

perform the job functions. [Id.].  According to the VE, while the three jobs he identified  required grasping; turning; and twisting; they did not require an ability to read. [AR at 382-383].

The ALJ then modified the hypothetical question, asking the VE how the job base would change if the hypothetical individual under consideration could lift and carry 20 pounds occasionally and 10 pounds frequently, and was limited to stooping on an occasional basis. [AR at 383].  The VE testified that such an individual would be able to perform unskilled jobs of light exertion, examples of which included small-parts assembler and food assembler, both of which existed in the regional and national economies. [AR at 384].  The VE described both jobs as requiring "very little communication[,]" since they primarily involved working with things, rather than people. [Id.].  The jobs also required frequent handling and reaching, but not fine manipulation. Finally, although both jobs "could be done either standing or sitting[, s]tanding would be the primary posture." [Id.].

On September 23, 2008, the ALJ issued a written opinion unfavorable to Mr. Cera, and denied his request for benefits. [AR at 76-85].  After finding that he met the insured status requirements of the Social Security Act through September 30, 2007, and that he had not been substantially gainfully employed since March 20, 2005, the ALJ determined that Mr. Cera suffered from a medically severe combination of the following impairments: (1) degenerative and discogenic disease of the cervical, lumbar, and thoracic spine; (2) a history of compression fracture of the T11-T12 vertebrae; (3) osteopenia; (4) a history of injury to the fourth digit on his right hand; (4) cold sensitivity of the digits on his left hand; and (5) a history of gastroesophageal reflux disease. [AR at 78].

The ALJ then found that none of Mr. Cera's impairments, either singly or in  combination, met or medically exceeded a listed impairment.  Finally, the ALJ concluded that, although Mr. Cera was unable to perform his past relevant work, he retained the residual functional capacity to perform

light work as described by the VE on the basis of the modified hypothetical question posed to him by the ALJ.  [AR at 79, 84].

Having considered the entire record, the ALJ determined that, while Mr. Cera's medically determinable impairments could reasonably be expected to produce the complained-of symptoms, Mr. Cera's statements as to the symptoms' intensity, persistence, and limiting effects were not entirely credible. [AR at 80].

For example, the ALJ pointed to Mr. Cera's claimed inability to sit for more than five minutes, notwithstanding that, as of the point in the hearing that he so testified, he had been sitting for more than that amount of time. [AR at 80].  The ALJ also noted that, while Mr. Cera complained of "very strong" back pain, numerous X-rays and medical reports from the years 2005 through 2007 indicated a largely normal and aligned spine (though evidence of old, healed compression fractures could also be seen). [AR at 80-81].  Moreover, records indicated that Mr. Cera's pain was well controlled with Vicodin which, by the time he saw Dr. DeArman on May 19, 2008, he was taking only on an as-needed basis. [AR at 82-83].  Finally, the ALJ commented on the August 15, 2007 clinic note from Dr. Selina Silva, wherein Dr. Silva stated that Mr. Cera was "back to work," although he was experiencing  difficulty.  The ALJ remarked that Mr. Cera "was not forthcoming about this at his hearing." [AR at 83].

The ALJ declined to give weight to Dr. Kilpatrick's opinions that (1) as of May 3, 2007, Mr. Cera was permanently disabled; and (2) because of a compression fracture of the T12 vertebra and a 30% loss of vertebral height, Mr. Cera was restricted from lifting objects weighing more than 10 pounds.  As an initial matter, the ALJ noted that the question of disability is one that is reserved for the Commissioner.  She then found that Dr. Kilpatrick's opinion as to Mr. Cera's compression fracture-related limitations was inconsistent with the overall medical evidence, which showed healed

compression fractures and a "largely normal" thoracic and lumbar spine.  The ALJ also noted that the medical evidence showed that Mr. Cera's pain was "well controlled" with Vicodin, which was proving to be "a very efficacious therapy for him."  [AR at 83].

In a letter dated September 29, 2008, Mr. Cera's attorney, James Rawley, asked the Appeals Council to review the ALJ's decision on grounds that (1) the ALJ erroneously disregarded Dr. Kilpatrick's opinion that Mr. Cera was permanently disabled as of May 3, 2007; and (2) the VE's testimony failed to establish the existence of jobs that Mr. Cera was able to perform. [AR at 69]. Notwithstanding that Mr. Rawley's letter to the Appeals Council clearly bears a date of September 29, 2008, on November 10, 2009, the Appeals Council dismissed the request for review as untimely filed, explaining that the request was not made until September 14, 2009. [AR at 66-68].  Mr. Rawley thereafter suggested that any confusion as to the date of filing must have occurred when, on September 14, 2009, his office sent the Appeals Council a *copy* of his September 29, 2008 request. [AR at 9].  Unpersuaded, on December 11, 2009, the Appeals Council upheld the dismissal, concluding that (1) Mr. Rawley failed to provide evidence that his request for review was timely made; and (2) no good cause existed to extend the filing deadline. [AR at 7].

On February 3, 2010, Mr. Rawley, on Mr. Cera's behalf, filed a *Complaint for Social Security Benefits*. [Doc. 1].   Instead of filing an Answer, on October 4, 2010, the SSA filed an *Agreed Motion to Remand Pursuant to Sentence Six*,[13] which was granted by *Order* entered October 13, 2010.  [See Docs. 12, 13].  On December 22, 2010, having set aside its December 11, 2009 decision for the purpose of considering additional information, the Appeals Council again denied

---

[13]  Pursuant to 42 U.S.C. § 405(g) the Court may order a "sentence six" remand without first ruling on the merits of the case if (1) the Secretary requests remand, for good cause, prior to filing his answer; or (2) new and material evidence comes to light, and there is good cause for failing to incorporate such evidence in the earlier proceeding.  Nguyen v. Shalala, 43 F.3d 1400, 1403 (10th Cir. 1994).

Mr. Cera's request for review.  [AR at 2-4].  This action had the effect of making the ALJ's decision

the final decision of the Commissioner of Social Security. [AR at 2-4].

By *Order* entered February 24, 2010, this Court granted the SSA's unopposed motion to

reopen Mr. Cera's case. [See Docs. 15, 16].  On May 27, 2011, Mr. Cera, through Mr. Rawley, filed

the *Motion and Memorandum of Law in Support of Motion to Remand Administrative Decision* that

is now before the undersigned Magistrate Judge for a recommended disposition.[14]

## II.    ANALYSIS

### A.    Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the denial of benefits to Mr. Cera

only if it determines that the denial is (1) not supported by substantial evidence; or (2) based on legal

error.  See Krauser v. Astrue, 638 F.3d 1324, 1326 (10th Cir. 2011).  "Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires

more than a scintilla, but less than a preponderance."  Raymond v. Astrue, 621 F.3d 1269, 1271-72

(10th Cir. 2009) (internal quotations omitted).  By contrast,  "[e]vidence is not substantial if it is

overwhelmed by other evidence in the record or constitutes mere conclusion."  Musgrave v.

Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).  A finding of "no substantial evidence" should be

made "only  where there is a 'conspicuous absence of credible choices' or 'no contrary medical

evidence.'"  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992) (*quoting* Hames v. Heckler,

707 F.2d 162, 164 (5th Cir.1983)).

---

[14]  The parties filed Rule 73(b)(1) consents, but those consents were filed one day past the March
28, 2011 deadline and, quite literally, minutes before this matter was reassigned to United States District
Judge Martha Vazquez and United States Magistrate Judge Lorenzo F. Garcia. [See Docs. 17, 23-25].

In order to determine whether a decision is supported by substantial evidence, the Court must "meticulously" examine the record as a whole. Musgrave, 966 F.2d at 1374.  Importantly, however, the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. Adams ex rel. D.J.W. v. Astrue, 659 F.3d 1297, 1301 (10th Cir. 2011).  Put differently,

> [t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] findings from being supported by substantial evidence. [This Court] may not displace the [ALJ's] choice between two fairly conflicting views, even though the [C]ourt would justifiably have made a different choice had the matter been before it de novo.

Cowan v. Astrue, 552 F.3d 1182, 1185 (10th Cir. 2008) (quoting Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir.2007)).  This Court's task is to "review only the *sufficiency* of the evidence, not its weight. . . ." Oldham v. Astrue, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original).

In assessing whether a claimant is disabled,[15] the ALJ is required to follow a five-step sequential evaluation process, with the claimant shouldering the burden of establishing a prima facie case of disability at steps one through four.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). At step one, the claimant must demonstrate that he is not presently engaged in substantial gainful activity.  Step two requires the claimant to show that he has a medically severe impairment or combination of impairments.  If, at step three, the claimant shows that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits.  If the claimant cannot meet a listing at step three, he continues to step four, which requires him to show that the impairment (or combination of impairments) prevents him from performing his past work.  If the

---

[15]  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §§ 423(d)(1)(A).

claimant satisfies his burden, the burden of proof shifts to the Commissioner at step five "to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the national economy, given his age, education, and work experience." Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005).

While the record must demonstrate that the ALJ *considered* all of the evidence, the ALJ is not required to *discuss* every piece of evidence. Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Instead, the ALJ must discuss the evidence that supports her decision, as well as any uncontroverted evidence she chooses not to rely upon, and significantly probative evidence she rejects. Id. at 1010. Additionally, while the ALJ must provide an evidentiary discussion and explanation of reasoning sufficient to enable meaningful judicial review, she need not employ any "magic" words, nor must she use any particular language or adhere to a particular format in conducting her analysis. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3rd Cir. 2009). With these legal principles as a framework, the Court now turns to Mr. Cera's motion.

### B.   Mr. Cera's *Motion and Memorandum of Law in Support of Motion to Remand Administrative Decision* [Doc. 30]

#### 1.   Mr. Cera's Assertion that a "Sentence Six" Remand is Appropriate

Mr. Cera raises two issues in his motion to remand. First, he argues that a second "sentence six" remand is justified because he is now in possession of "additional medical information and evidence" that was not available at the time the ALJ issued her decision on September 23, 2008. [Doc. 30 at 2, 4]. This additional information is described as: (1) a December 4, 2009 letter from Mr. Cera's treating physician, Dr. Tim Wilcox, containing "additional medical information [that] contradicts several of the ALJ's findings[;]" (2) a February 10, 2010 comprehensive psychological evaluation conducted by Eligio R. Padilla, Ph.D., and allegedly showing Mr. Cera's "serious mental

disabilities[;]" (3) a May 18, 2010 consultative examination performed by physicians at the New Mexico Department of Vocational Rehabilitation ("DVR"), the findings from which "tend to contradict the residual functional capacity [determination] of the ALJ[;]" (5) a September 9, 2010 letter from Martha Jaramillo, a rehabilitation technician with the DVR, in which Ms. Jaramillo explains that Mr. Cera's learning disabilities prevent his participation in vocational rehabilitation and educational programs; and (6) a November 9, 2010 *Discharge Treatment Plan* from UNMH that, because it recommends physical therapy for Mr. Cera, "tends to contradict the findings of the ALJ." [Id. at 2-3].

Section 405 of Title 42 of the United States Code contemplates two types of remands in Social Security cases.  See Sullivan v. Finkelstein, 496 U.S. 617, 623-629 (1990).  As is relevant here, the sixth sentence of 42 U.S.C. § 405(g) provides, in pertinent part, that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ." 42 U.S.C. § 405(g). When a court remands pursuant to sentence six, it

> does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding.

Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991).

For purposes of a "sentence six" remand, however, evidence is considered material only if it is "relevant to the claimant's condition *during the time period* for which benefits were denied. . . ." Chubbuck v. Astrue, 2011 WL 2446308, *1 (D.Conn. June 17, 2011) (emphasis added); see also

16

Wilson v. Astrue, 2011 WL 3924862, *4 (S.D.Miss. Aug. 15, 2011) (to be deemed material for "sentence six" remand, evidence must relate to time period for which benefits were denied); Kuperman v. U.S. Soc. Sec. Admin., Comm'r, 2008 WL 4159152, *3 (D.N.H. Sept. 9, 2008) (same). "Material" evidence is evidence that might reasonably have caused the ALJ to issue a different opinion, had the new evidence been before her at the relevant time.  See Wilson v. Astrue, 602 F.3d 1136, 1148 (10th Cir. 2010). By contrast, evidence of a later-acquired disability, or even of the subsequent deterioration of a previously non-disabling condition, may provide a basis for a new application for disability benefits, but does not justify a "sentence six" remand.  See Williams v. Barnhart, 178 F. App'x 785, 792 n.5 (10th Cir. 2006); accord Leggett v. Chater, 67 F.3d 558, 566-567 (5th Cir. 1995).

          In this case, the alleged "additional medical information and evidence" proffered by Mr. Cera cannot be deemed "material" for purposes of sentence six of 42 U.S.C. § 405(g) because not one item or piece of information or evidence relates to the time period for which benefits were denied, to wit, the three and one-half years between March 20, 2005 (date of onset) and September 23, 2008 (date of unfavorable decision).  To the contrary, the earliest date shown on any of Mr. Cera's pieces of additional information submitted is December 4, 2009, which is more than one year after the ALJ issued her decision denying benefits. [See Doc. 30 at 2; see also AR at 85].  The burden is on Mr. Cera to demonstrate that his alleged current condition and disabilities relate back to the period of time under review, as opposed to (1) having developed after he applied for benefits; or (2) indicating the deterioration of a condition that the ALJ previously found to be not disabling. See Williams, 178 F. App'x at 792; Leggett, 67 F.3d at 567.  Mr. Cera's evidence does not satisfy this burden.

Additionally, Mr. Cera does not show good cause for not having presented his "additional medical information and evidence" during his hearing before the ALJ.  As an initial matter, the Court notes that Mr. Cera does not even address the "good cause" requirement, positing instead that "[a] claimant need not show 'good cause' before submitting the new evidence *to the Appeals Council*." [Doc. 34 at 2 (emphasis added)].  While this may be true when a claimant, pursuant to 20 C.F.R. § 404.970,[16] asks the Appeals Council to review an unfavorable decision of the ALJ, Mr. Cera expressly moves for a "sentence six" remand. [See Doc. 30 at 4 ("A sentence-six remand is appropriate in this case as additional information and medical evidence has been adduced since the

---

[16]  Section 404.970 details the circumstances under which the Appeals Council is to review a decision of the ALJ and provides:

> (a) The Appeals Council will review a case if--
>
> (1) There appears to be an abuse of discretion by the administrative law judge;
>
> (2) There is an error of law;
>
> (3) The action, findings or conclusions of the administrative law judge are not supported by substantial evidence; or
>
> (4) There is a broad policy or procedural issue that may affect the general public interest.
>
> (b) If new and material evidence is submitted, the Appeals Council *shall* consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council *shall* evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It *will* then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970 (emphasis added).

18

time of the ALJ's decision.")].  The Fourth Circuit case upon which Mr. Cera relies supports as much, specifically confirming that

> [a] claimant seeking a remand on the basis of new evidence under . . . § 405(g) . . . must show that the evidence is new and material *and must establish good cause for failing to present the evidence earlier*[, although t]here is no requirement that a claimant show good cause when seeking to present new evidence before the Appeals Council.

Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 n.3 (4th Cir. 1991) (emphasis added).  Just as important, however, is the fact that "[a] claimant does not meet the good cause requirement by merely obtaining a more favorable report once his . . . claim has been denied." Mayes v. Massanari, 276 F.3d 453, 463 (9th Cir. 2001).  Instead, he must  demonstrate that his new evidence was unavailable earlier.  Id.  In this case, Mr. Cera has failed to make such a showing.  For the above-stated reasons, Mr. Cera has not met his burden of showing that a "sentence six" remand is proper here.

### 2.    Mr. Cera's Argument that the ALJ Should Have Given Controlling Weight to Dr. Kilpatrick's Opinions

For his second argument in support of remand, Mr. Cera contends that the ALJ should have accorded controlling weight to the opinions of Dr. Kilpatrick, to whom Mr. Cera refers as his "treating physician."  [Doc. 30 at 4-6].  According to Mr. Cera, "[t]he ALJ's refusal to give any weight . . . at all to Dr. Kilpatrick's opinions" goes against "the overwhelming majority" of the medical evidence, as well as Mr. Cera's testimony, and stands in contradiction to other parts of the ALJ's own decision.  [Id. at 5].  Had the ALJ credited Dr. Kilpatrick's opinions, continues Mr. Cera, she would necessarily then have had to find him disabled, with a residual functional capacity of "less than sedentary," if not "sedentary." [Id. at 5-6].

In response, the SSA argues that (1) Dr. Kilpatrick should not be considered a "treating physician" whose opinions are entitled to controlling weight; (2) the ALJ properly weighed Dr. Kilpatrick's opinions and provided reasons for assigning them no weight; and (3) the ALJ correctly disregarded Dr. Kilpatrick's opinion that Mr. Cera was permanently disabled, as such an opinion is not a medical opinion but, instead, a determination reserved to the Commissioner.  [See Doc. 31 at 7-10].

"Treating source medical opinions are [ ] entitled to deference," and must be either given controlling weight or assigned some lesser weight "using all of the factors provided in 20 C.F.R. 404.1527 and 416.927."  Andersen v. Astrue, 319 F. App'x 712, 717, 2009 WL 886237 (10th Cir. Apr. 3, 2009) (unpublished) (citing SSR 96-2p, 1996 WL 374188, at *4).  To ensure that treating physician opinions receive proper deference, an ALJ must engage in a sequential analysis.  Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003).

First, an ALJ determines if the treating physician's opinion is entitled to controlling weight. Id.  A treating source opinion is entitled to controlling weight if it is well-supported by clinical and laboratory diagnostic techniques and is consistent with other substantial evidence.  Hackett v. Barnhart, 395 F.3d 1168, 1173–74 (10th Cir. 2005).  If both of these conditions are met, no other factors need be considered and the inquiry is at an end.  20 C.F.R. § 404.1527(d)(2); Watkins, 350 F.3d at 1300.

If, however, one or both of these conditions is lacking, an ALJ is not free to simply disregard the opinion or pick and choose which portions to adopt.  In other words, the treating physician's opinion "is still entitled to deference."  In Watkins, the Tenth Circuit explained

> a finding that a treating source medical opinion is not well-supported
> by medically acceptable clinical and laboratory diagnostic techniques
> or is inconsistent with the other substantial evidence in the case

> record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.

Watkins, 350 F.3d at 1300-01.

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, she then makes a second determination, where she must both (1) weigh the opinion "using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927" and (2) "give good reasons in the notice of determination or decision for the weight [the ALJ] ultimately assigns the opinion."  Watkins, 350 F.3d at 1300-01 (internal quotation marks and alteration omitted).

> . . . [T]he regulatory factors are: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship . . .; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the [pertinent] area . . . ; and (6) other factors . . . .
>
> Although the ALJ's decision need not include an *explicit discussion* of each factor, . . . , the record must reflect that the ALJ *considered* every factor in the weight calculation.

Andersen, 319 F. App'x at 718 (internal citations omitted) (emphasis in original) (*citing* Watkins, 350 F.2d at 1300-01).  If an ALJ rejects the treating physician's opinion completely, "she must give specific legitimate reasons for doing so."  Lopez v. Astrue, 371 F. App'x 887, 889 (10th Cir. Mar. 29, 2010) (unpublished) (citing Watkins, 350 F.3d at 1301.)  See id. ("Under the regulations, the agency rulings, and [Tenth Circuit] case law, an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion.") (internal quotations omitted).

Here, in evaluating Dr. Kilpatrick's opinion, it is true that Mr. Cera only saw Dr. Kilpatrick on three occasions over a period of about a year and a half.  The Commissioner understandably argues that it is questionable whether Dr. Kilpatrick qualifies as a treating physician in light of the few occasions Dr. Kilpatrick treated Mr. Cera.  See Doyal v. Barnhart, 331 F.3d 758, 763 (10th Cir. 2003) (*citing* 20 U.S.C. § 416.927(d)(2)(i)) ("[a] physician's opinion is deemed entitled to special weight as that of a 'treating source' when he has seen the claimant 'a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment[.]"  See also, Branson v. Callahan, 14 F.Supp.2d 1089, 1098 (N.D. Iowa 1998) (affirming rejection of physician's opinion who only saw the claimant two times over a period of two years, particularly when the claimant was seen by other doctors).

However, notwithstanding Dr. Kilpatrick's few visits with Mr. Cera, the ALJ referred to or identified Dr. Kilpatrick as a treating physician. [See AR 83] (in the paragraph discussing Dr. Kilpatrick's opinion, the ALJ stated that "[w]hile normally controlling weight would be given to an opinion of disability from a treating physician it is not entitled if it is inconsistent with other substantial evidence of record.").  Because of the ALJ's reference to Dr. Kilpatrick as a treating physician, the Court examines whether the ALJ conducted the required treating physician analysis, whether she committed error, or whether substantial evidence supported her analysis.  Accordingly, the Court rejects the Commissioner's argument that Dr. Kilpatrick was not a treating physician

under the circumstances of this case, where the ALJ referred to Kilpatrick as a treating physician.[17]

There are two opinions of Dr. Kilpatrick's at issue.  The ALJ stated–

> I do not give any weight to Dr. Kilpatrick's opinion as reported above on May 3, 2007 that the claimant was permanently disabled as of May 3, 2007.  I find his opinion that the claimant was limited from lifting of objects greater than 10 pounds because of a compression fracture of the T12 and approximately 30 percent loss of vertebrae body height to be inconsistent with the overall medical evidence.

[AR 83.] The ALJ then discussed two x-rays taken in 2005 that were conflicting as to whether Mr. Cera suffered from compression fractures, along with an MRI taken in 2007 indicating that the old T11 and T12 compression fractures had healed. [AR 83.] The ALJ further stated that the ultimate question of disability was a matter reserved for the Commissioner. [AR 83.] The ALJ then noted current 2008 medical records indicating Mr. Cera's chronic back pain was well controlled with Vicodin which had been an efficacious therapy for him that he no longer needed on an around-the-clock basis. [AR 83.]

While the ALJ did not give controlling weight to Dr. Kilpatrick's opinions, she did not specify what weight, if any, she assigned to his opinions.  Moreover, while the ALJ concluded that Dr. Kilpatrick's restrictions and opinions were inconsistent with the "overall medical evidence," this is not correct.

---

[17]The Court further comments that Mr. Cera's few visits with Dr. Kilpatrick may reflect a hurdle he could not have overcome.  Realistically, an individual like Mr. Cera, who is indigent, homeless, and illiterate, may not be able to see one physician routinely for purposes of establish a treating physician relationship.  Yet, while the Court's earlier recommendations relied on that type of reasoning for proposing remand, the Court now proposes remand on other grounds.  Even though the undersigned magistrate judge's discussion of the effects of indigency and illiteracy highlighted serious and realistic societal problems, the Court concludes such reasoning impermissibly expanded the scope of its review, and amounted to an improper reweighing of the evidence and substitution of judgment.  Thus, those reasons no longer support the proposal to remand in these amended recommendations.

For example, the results from 2005 x-rays and the 2007 MRI, that were noted by the ALJ, are conflicting as to the existence of compression fractures.   Indeed, most of the objective medical evidence indicates that Mr. Cera did suffer compression fractures.   For example, the radiology report, dated September 20, 2005, states "compression fracture, especially at T12 and possibly T11 of uncertain age." [AR 297.] A referral note from Sandia Health System, presumably dated 9/20/2005 or 9/20/2006, states "Compression T11 & T12." [AR 302.]  A "consult request," dated October 21, 2005, from Dr. Kilpatrick states: "41 yo SSO male with T11-T12 compression fx." [AR 323.] Medical record notes from Healthcare for the Homeless in 2006 indicate compression fracture at T11 and T12. [AR 281, 282.] On April 13, 2006, Dr. Sandra Penn filled out a Medical Release/Physician's Statement documenting a diagnosis of compression fractures T11, 12 and restricting Mr. Cera to lifting no more than 5 pounds for 12 months. [AR 301.] On February 15, 2007, Dr. Kilpatrick noted Mr. Cera's continuing complaints of pain in his "mid back," notwithstanding the one 2005 x-ray that showed no evidence of a compression fracture. [AR 259.] New x-rays in February 2007 revealed a compression fracture of the T12 vertebral body with approximately 30% loss of the vertebral body height. [AR 257.] Dr. Kilpatrick's Medical Release/Physician Statement, dated May 3, 2007, provided a diagnosis of T12 compression fracture and restricted Mr. Cera to no lifting over 10 pounds. [AR 268.]  The August 9, 2007 MRI report states "there was mild anterior loss of height of the T12 vertebral body, consistent with a compression fracture, which was seen on the L-spine radiographs on 2/15/07." [AR 231.] Dr. John Leggott saw Mr. Cera on October 4, 2007, indicating he had vertebral compression fractures as confirmed on MRI. [AR 222.]  In 2008, Dr. Maria DeArman, who saw Mr. Cera more often than any one physician during this period, filled out a Provider's Statement/Medical Release, stating that as a result of Mr. Cera's T12 compression fracture, he was unable to work as of May 3, 2004, for

an unknown length of time, and she restricted Mr. Cera to lifting objections not weighing more than 15 pounds. [AR 204.]

There are few records to the contrary, *i.e.,* that state Mr. Cera did not suffer from compression fractures. One of these records was authored by a nurse practitioner on December 9, 2005, when Dr. Kilpatrick was unavailable to see Mr. Cera. The nurse practitioner stated that Mr. Cera had some degenerative changes pronounced in his lower thoracic spine with triangulation of T1 [sic?] and T12. [AR 325.] There is a radiology report, dated October 21, 2005, indicating no evidence of compression fracture in the thoracic spine. [AR 334.] Dr. Selina Silva, who saw Mr. Cera for a single visit on August 15, 2007, stated that while there were T11 and T12 compression fractures, they were healed. [AR 224.] In contrast to these few records negating or minimizing evidence of compression fractures, a significant number of treatment records document Mr. Cera's continued efforts to seek treatment in 2005-2008 for chronic back pain.

The objective medical evidence of record demonstrates that Dr. Kilpatrick's opinion and restriction are "well-supported by clinical and laboratory diagnostic techniques and consistent with other substantial evidence." However, even if the ALJ had shown otherwise through substantial conflicting evidence, the ALJ was not free to simply disregard Dr. Kilpatrick's opinions. Yet, that is what she did. While the ALJ did not expressly state that she rejected Dr. Kilpatrick's opinions in their entirety, she gave them no deference at all, which is improper.

If the ALJ decided not to give Dr. Kilpatrick's opinions controlling weight, she was required to assess his opinions in view of the pertinent regulatory criteria. See SSR 96-2p, 1996 WL 374188, at *4 (listing factors). Although she was not required to explicitly discuss all of those regulatory factors, the ALJ did not expressly discuss any of the factors. Based on the ALJ's summary of the medical records, one might infer she had considered some of the regulatory factors, but this is

insufficient.   When completely rejecting a treating physician's opinion, the ALJ "must give specific legitimate reasons for doing so."   In addition, the ALJ should have set forth good reasons for a specific weight she assigned the treating physician's opinion.  Lopez, 371 F. App'x at 889-890.

Here, the Court has no way to review what weight, if any, the ALJ gave Dr. Kilpatrick's opinion.  Moreover, the Court concludes that to the extent the ALJ rejected Dr. Kilpatrick's opinion in its entirety, the ALJ did not set forth reasons that were supported by substantial evidence.

The Court acknowledges the ALJ's position that the question of disability is a matter reserved for the Commissioner. [AR 83.] See 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96–5p, 1996 WL 374183, at *2 ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.").   However, even so, "the ALJ still was required 'to articulate [what] weight, if any," she assigned to Dr. Kilpatrick's opinion.  See Lopez, 371 F. App'x at 892 (citing SSR 96-5p, 1996 WL 374183, at *3 ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored . . . .").   In this case, the ALJ either ignored Dr. Kilpatrick's opinions or committed error by not articulating what weight she assigned to the opinions.

For all of the above-stated reasons, the Court recommends that this matter be remanded for additional administrative proceedings during which the ALJ should employ the required treating physician analysis and re-determine the RFC, as appropriate.

## III.   RECOMMENDATION

On the basis of the foregoing, it is the recommendation of the undersigned Magistrate Judge that Plaintiff Socorro Olivas Cera's *Motion and Memorandum of Law in Support of Motion to*

*Remand Administrative Decision* [Doc. 30] be granted, and that this matter be remanded for additional administrative hearings.

Lorenzo F. Garcia
United States Magistrate Judge